UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CHELSSEA TOMPKINS, | |
| Plaintiff, | |
| v. | Civil Action No. |
| WAL-MART STORES, INC. and WAL-MART STORES EAST, LP, | |
| Defendants. | |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Chelssea Tompkins ("Tompkins"), by and through undersigned counsel, and complains against the Defendants, Wal-Mart Stores, Inc. and Wal-Mart Stores East, LP ("Walmart"), as follows:

INTRODUCTION

1.     This action arises under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.,* the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.,* and the Maine Family Medical Leave Requirement Act ("MFMLR"), 26 M.R.S. §§ 844 *et seq.*

PARTIES AND JURISDICTION

2.     Tompkins is a United States citizen residing in the village of Farmington Falls, County of Franklin, State of Maine.

3.     Defendant Wal-Mart Stores, Inc. is a Delaware corporation with its principal place of business in Arkansas.

4.      Defendant Wal-Mart Stores East, LP is a Delaware limited partnership with its principal place of business in Arkansas.

5.      The alleged discriminatory acts set out in this Complaint arose in the State of Maine, primarily in Kennebec County.

6.      Upon information and belief, Defendants operate as an integrated enterprise.  They have common ownership.  They have common management.  They exercise centralized control over labor relations.  Their operations are interrelated.

7.      Plaintiff and Defendants are citizens of different states for purposes of 28 U.S.C. § 1332.

8.      The amount of controversy in this case exceeds $75,000.

9.      This Court has subject matter jurisdiction over Plaintiff's federal and state law claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

10.      Venue properly lies in the District of Maine pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial district.

11.      At all times material to this case, each Defendant employed more than fifty employees within seventy five miles of the Waterville, Maine location where Plaintiff was employed.

12.      At all times material to this case, there were more than 15 employees employed at the Waterville, Maine store where Plaintiff was employed.

13.      Each of the Defendants employed more than 500 employees during all calendar weeks of 2016 and 2017.

14.      On or about November 22, 2016, Plaintiff filed a timely Charge of Discrimination, with respect to the allegations herein, with the MHRC and EEOC.

15.      On or about July 25, 2017, the MHRC issued a Notice of Right to Sue to Plaintiff.

16.     On or about July 18, 2017, the EEOC issued a Notice of Right to Sue to Plaintiff.

17.     Plaintiff has exhausted all administrative remedies for purposes of each of his claims.

18.     At all material times, Defendants employed Plaintiff within the meaning of the Title VII, ADA, FMLA, MHRA and MFMLR.

## JURY TRIAL DEMAND

19.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable of right by jury.

## FACTUAL ALLEGATIONS

20.     Tompkins worked for Walmart from about May 1, 2012 to about January 21, 2013.[1] At the time, her last name was Vieira.

21.     In March 2015, Tompkins applied for a job at Walmart again. She was interviewed and offered a job as Sales Associate. She was offered part time hours (24-28 per week) and wages of $7.70 per hour. She started work at Store #2013 in Waterville, Maine on April 9, 2015.

22.     Tompkins got married in July 2015 and changed her last name from Vieira to Tompkins.

23.     Also in July 2015, Tompkins received a promotion to Department Manager (Ladies). It was a full time job, 40 hours per week. She received a pay increase to $10.75 per hour and qualified for health, dental, and vision benefits as well as 401k, STD, LTD, and life insurance.

---

[1] These dates are based on Tompkins's best recollection. Wal-Mart has stated that Tompkins was initially hired in January 2013, that she worked for eight months, and that her employment ended when Tompkins failed to return from a leave of absence. Tompkins did not take a leave of absence during her first period of employment.

24.     Tompkins became pregnant soon after she was married.

25.     Walmart knew about Tompkins' pregnancy by September 2015.

26.     Tompkins' pregnancy was complicated and she missed some time from work.

27.     Tompkins was counseled about her absences on September 13, 2015. She told Walmart that her absences were pregnancy-related.

28.     Tompkins' absences were protected leave under the MHRA and Title VII (pregnant woman not able to work) and the FMLA and MFMLR.

29.     Tompkins requested protected medical leave on October 1, 2015 and again on October 31, 2015. Her requests were denied.

30.     Tompkins developed severe back and sciatic nerve impairments as a complication of her pregnancy.

31.     On December 23, 2015, Tompkins' leg gave out and she was unable to work.

32.     Tompkins started a continuing medical leave of absence beginning on December 24, 2015.

33.     Tompkins' leave of absence that began on December 24, 2015 was protected leave under the ADA (disability), MHRA and Title VII (pregnant woman not able to work), and the FMLA and MFMLR.

34.     Walmart immediately hired a permanent replacement to fill Tompkins' Department Manager (Ladies) position.

35.     Upon information and belief, the person hired to replace Tompkins was Roqumita Hughes.

36.     It was not an undue burden for Walmart to hold Tompkins' job open until she returned to work. Walmart could have had an Assistant Manager cover for Tompkins or appointed and trained a temporary Department Manager.

37.     While Tompkins was on medical leave of absence, she kept in touch with Walmart's third party leave administrator, Sedgwick, and provided Sedgwick with medical updates and made requests for extensions of leave as needed.

38.     On about February 10, 2016, Tompkins was notified that she had been terminated from employment by Walmart due to "failure to return from LOA."

39.      Tompkins called the Waterville Store Manager, Cindy Parent, when she learned that she was terminated. Parent told Tompkins that she would look into it.

40.     Tompkins also spoke to Personnel Coordinator Kim Furbush about her employment status and to Shift Manager Erica Gregoire. Tompkins received a letter stating that a mistake had been made and that they were reinstating her employment.

41.     Walmart has admitted that it should not have terminated Tompkins in February 2016.

42.     Walmart put Tompkins back in the system with May 2012 as her date of hire and gave her the job title she held at that time which was OTC Stock Associate in Pharmacy instead of Department Manager (Ladies), the job title she held when her medical leave of absence began.

43.     Gregoire told Tompkins that she was working on Tompkins' situation and invited Tompkins to call her after she had the baby and was ready to come back to work.

44.     Tompkins knew that Walmart had already filled her Department Manager position.

45.     Tompkins told Gregoire and Furbush that she wanted her Department Manager position back when she was ready to return to work.

46.     Tompkins told Gregoire and Furbush that if that was not possible, she would need to work nights because she could not afford child care if she was going to be getting lower pay and no benefits.

47.     Gregoire told Tompkins that she would schedule her for overnights when she was ready to come back to work. Based on the promise of overnight work, Tompkins gave up her child care arrangements. She could not afford childcare making $7 - $8 per hour.

48.     Tompkins' baby boy was born on April 26, 2016.

49.     On May 19, 2016, Sedgwick approved Tompkins for protected MFMLR leave from April 26, 2016 through June 6, 2016.

50.     On May 24, 2016, Tompkins was released to return to work as of May 30, 2016.

51.     Tompkins faxed the doctor's note to Walmart and called the store to inquire about her return to work.

52.     Tompkins asked to speak to Gregoire and was told that Gregoire did not work at the Waterville store anymore.

53.     Tompkins spoke to Furbush and was told that they would not give her back her Department Manager position and that they could not give her a job working nights.

54.     Between May 24 and June 17, 2016, Tompkins tried to work with Furbush and the Waterville store on getting back to work.

55.     Walmart claims that Furbush offered Tompkins a position as OTC Pharmacy Sales Associate, which is false.

56.     Tompkins was offered a cashier position, one of the lowest positions in the company. It was a "float" position with no guaranteed hours and no set schedule. Tompkins could not accept that job given her child care needs.

57.     Tompkins was offered a Cap team II position, but the hours were from 3:00 to 11:00 pm which she could not manage given her child care needs.

58.     Tompkins was offered and accepted a full time maintenance job working nights. After she accepted that job, Tompkins was told that the job was not available after all.

59.     Walmart claims that on June 15, 2016 Tompkins visited the store and reviewed an open full time Overnight Stocker position but declined it because she only wanted to work part time. None of this is true. Tompkins was told that there were no Overnight Stocker positions. She was told that there was an overnight maintenance position. She went to the store to accept the job and sign the job proposal. When she got there, Furbush told Tompkins that they "closed the req" (meaning the job was no longer available).

60.     Tompkins was offered a position on the remodeling crew. It was a temporary job and the pay was not determined. She accepted that job although she was concerned that when the work was completed, she would lose her job. Temps are not regular employees and are subject to lay off when the temporary job ends. Tompkins traveled to Waterville in person to formally accept the position. She called in advance and Furbush told her to come in.

61.     When Tompkins got to the Waterville store, no one was available to interview her. The only people who can interview and hire employees are Store Managers and Assistant Managers. Co-managers were there when Tompkins came in but they said they couldn't help her.

62.     Walmart claims that Shift Manager Bridget Cremin asked Tompkins to come to the store when she was present and told Tompkins her schedule and that when Tompkins arrived

at the store on July 15, Cremin was not there. These facts are not accurate. Tompkins set up a meeting with Furbush on July 15 and when she got there, Furbush was not available. That was the third time Furbush missed a scheduled meeting with Tompkins.

63.    Tompkins finally gave up her efforts to get rehired.

64.    No one from Walmart called Tompkins after her last unsuccessful attempt to meet with Furbush.

65.    Instead, on about July 23, 2016, Tompkins received a separation notice from Walmart stating "failure to return from LOA – failed to come in and return to position until one could be opened for her preference."

*Membership in protected classes*

66.    Pregnancy and pregnancy-related conditions: Tompkins' pregnancy-related complications (including her severe back and sciatic nerve impairments) are medical conditions resulting from pregnancy. The birth of Tompkins' son and Tompkins' pregnancy-related conditions are protected under the MHRA, Title VII, FMLA and MFMLR.

67.    Disabilities: Tompkins' severe back and sciatic nerve impairments are also disabilities. Tompkins' leg gave out and she was unable to work from December 23, 2015 through May 30, 2016. The definition of disability includes a physical impairment that substantially limits a major life activity. Walking and working are major life activities.

68.    Tompkins was also regarded as disabled.

69.    The term "qualified individual with a disability" means an individual with a physical or mental disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires.

70.     Tompkins was qualified for the position she held as a Department Manager for Walmart and would have been able to return to work and again perform all duties of her position as of May 30, 2016 with the accommodation of a medical leave of absence. *Criado v. I.B.M*, 145 F.3d 437 443 (1st Cir. 1998) (assuming for purposes of the "qualified" analysis that the leave requested by the employee is a reasonable accommodation).

71.     Serious Health Condition: Tompkins' severe back and sciatic nerve impairment constituted chronic conditions as defined by the FMLA and MFMLR insofar as they required periodic visits for treatment by health care providers, continued over an extended period of time, and caused a significant period of incapacity.

*Protected activity and protected leave under the FMLA and MFMLR*

72.     Tompkins qualified for leave under the FMLA when she missed work due to her serious health condition in the fall of 2015 and when she began her medical leave of absence from work in December 2015.

73.     Tompkins qualified for leave under the MFMLR after she had been employed 12 consecutive months as of April 9, 2016.

74.     Walmart was a covered employer.

75.     Tompkins was a covered employee having worked for Walmart for at least 12 months (May 1, 2012 to January 21, 2013 plus April 9 to December 23, 2015) and at least 1,250 hours during the 12 months prior to December 23, 2015. Tompkins was employed at a location where there are at least 50 employees within 75 miles and at least 15 employees at her work site.

76.     Tompkins engaged in protected activity under the FMLA and MFMLR by requesting protected leave for her serious health conditions.

77.     Walmart unlawfully denied Tompkins' request for FMLA.

78.     Walmart unlawfully violated Tompkins' rights under the MFMLR when it approved her for protected leave and then failed and refused to permit her to return to her own position, a substantially equivalent position, or any position that Tompkins would be able to accept.

79.     When Tompkins commenced her leaves of absence, she was entitled to be restored to the position she held at the start of her leave (Department Manager [Ladies]) or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

*Failure to provide reasonable accommodation (medical leave of absence)*

80.     Under the ADA, unlawful discrimination includes not making reasonable accommodations to the known physical limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity.

81.     In proving that an accommodation is reasonable, plaintiff must show "not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." *Reed v. Lepage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001).

82.     It is defendant's burden to show that no reasonable accommodation exists or that the proposed accommodation would cause an "undue hardship." Me. Hum. Rights Comm'n Reg. 3.08(D)(1) (July 17, 1999); 42 U.S.C. § 12112(5)(A); *Plourde v. Scott Paper Co.*, 552 A.2d 1257, 1261 (Me. 1989).

83.    "Undue hardship" means "an action requiring significant difficulty or expense," 42 U.S.C. § 12111(10)(A).

84.    Holding Tompkins' job open for her would not have caused Walmart significant difficulty or expense. Walmart could have had an Assistant Manager cover for Tompkins or appointed and trained a temporary Department Manager.

85.    In her Complaint/Charge of Discrimination filed with the MHRC and EEOC, Tompkins asserted that it was reasonable for Walmart to hold open her position as Department Manager while she was out on medical leave of absence. Walmart did not dispute Tompkins' allegations and submitted nothing that would prove that it would have been an undue hardship to hold Tompkins' position open until she returned.

86.    Instead, Walmart asserted that Tompkins was consulted by Parent and asked for her input about whether Walmart should hire someone to replace her (Tompkins) as Department Manager. Walmart claims that Tompkins told Parent and Gregoire that she preferred being demoted to Overnight Stocker when she was ready to return. Walmart's claim is untrue and implausible.

*Treating a pregnant woman who is not able to work differently from other employees who are not able to work due to other disabilities or illnesses*

87.    It is unlawful discrimination under the MHRA and Title VII for an employer to treat a pregnant woman who is not able to work because of a disability or illness resulting from pregnancy, or from medical conditions which result from pregnancy, in a different manner from other employees who are not able to work because of other disabilities or illnesses.

88.     Walmart had the same duty to accommodate Tompkins' inability to work due to pregnancy-related conditions in the same manner that Walmart accommodates employees with other disabilities and serious medical conditions.

*Adverse employment actions*

89.     Walmart acted unlawfully by disciplining Tompkins in the fall of 2015 for absences that were protected under the FMLA and MFMLR.

90.     Walmart acted unlawfully by immediately hiring a permanent replacement to fill Tompkins' Department Manager position when Tompkins began a medical leave of absence in December 2015. (Upon information and belief, the person hired to replace Tompkins was Roqumita Hughes.)

91.     Walmart acted unlawfully by terminating Tompkins' employment on about February 10, 2016.

92.     Walmart acted unlawfully by failing to reinstate Tompkins to her own position after unlawfully terminating her employment.

93.     Walmart acted unlawfully by failing to allow Tompkins to resume work at Walmart when she was released to return to work on about May 30, 2016.

94.     Walmart acted unlawfully by failing to permit Tompkins to return to other night shift positions at Walmart as discussed with her manager.

95.     Walmart acted unlawfully by terminating Tompkins' employment again on about July 23, 2016.

*Pretext*

96.     Walmart's rationales for failing to permit Tompkins to resume work at Walmart between May and July 2016, and for terminating her employment, are false and pretextual.

97.     Walmart is dissembling the facts to cover up the fact that it refused to permit Tompkins to return to work because of her serious health conditions, disabilities, and her status as a mother with a very young baby.

98.     In defending against Tompkins' claim that her efforts to return to work in June and July 2016 were thwarted by Walmart's managers, Walmart claims that it was Tompkins who declined and refused jobs, which is false. Tompkins had limitations on what jobs she could accept. When Walmart took away Tompkins' Department Manager position, she could no longer afford childcare and was limited to working nights. Walmart had overnight jobs and Tompkins accepted two of them. She traveled to the store to interview for and accept the jobs. Walmart withdrew one of the offers. Tompkins' efforts to accept the job on the remodeling crew were sabotaged by Furbush, Walmart's employee, who failed to keep her appointments to meet with Tompkins.

*Summary*

99.     Walmart violated Tompkins' rights under the FMLA and MFMLR by disciplining her for intermittent absences that were protected leave, by immediately filling her position with a permanent replacement when Tompkins began continuous leave in December 2015, by terminating her employment on February 10, 2016, by failing to return her to her own position after she was unlawfully terminated on February 10, 2016, and by failing to hold her position and permit her to return to the position at the conclusion of her leave.

100.    Walmart retaliated against Tompkins for requesting protected leave under the FMLA and MFMLR by terminating her employment on about February 10, 2016, by failing and refusing to allow Tompkins to resume work at Walmart when she was released to return to work

on about May 30, 2016, and by terminating Tompkins' employment again on about July 23, 2016.

101.    Walmart violated Tompkins' rights under the MHRA, ADA and Title VII by failing to hold her position for her as a reasonable accommodation and hiring a permanent replacement for her Department Manager (Ladies) position soon after her leave of absence began in December 2015.

102.    Walmart violated Tompkins' rights under the MHRA, ADA and Title VII by terminating her employment on about February 10, 2016 and then putting her back in the system in a low-level job (OTC Stock Associate in Pharmacy) instead of a Department Manager position.

103.    Walmart violated Tompkins' rights under the MHRA, ADA and Title VII between May 30 and July 15, 2016 by not bringing her back to work in a Department Manager position, offering her jobs that it knew she could not accept, and not keeping appointments with her so that she could be interviewed and return to work.

104.    Walmart violated Tompkins' rights under the MHRA, ADA and Title VII by failing to rehire her into open positions for which she was qualified and available.

105.    Walmart violated Tompkins' rights under the MHRA, ADA and Title VII by terminating her employment on about July 23, 2016.

106.    Walmart violated Tompkins' rights under the MHRA, ADA and Title VII by retaliating against her for requesting reasonable accommodations.

107.    Walmart knowingly and willfully violated Tompkins' rights under the ADA, Title VII, FMLA, MHRA and MFMLR.

14

108.    Walmart unlawfully discriminated against Tompkins with malice or reckless indifference to her rights.

109.    As a result of Walmart's unlawful discrimination against Tompkins, she has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

110.    Tompkins has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and she will continue to suffer irreparable injury from her treatment by Walmart unless and until Walmart is enjoined by this court.

COUNT I: MHRA
UNLAWFUL DISCRIMINATION

111.    Paragraphs 1-110 are incorporated by reference.

112.    Walmart's conduct constitutes unlawful sex (pregnancy) and disability discrimination against Tompkins in violation of the MHRA.

COUNT II: MHRA
FAILURE TO ACCOMMODATE

113.    Paragraphs 1-112 are incorporated by reference.

114.    Walmart violated the MHRA by failing to provide reasonable accommodation to her for her pregnancy in the same manner it reasonably accommodates other employees who are not pregnant.

COUNT III: MHRA
UNLAWFUL RETALIATION

115.    Paragraphs 1-114 are incorporated by reference.

116.    Walmart violated the MHRA by retaliating against Tompkins because she required and used medical leaves as accommodations for her pregnancy-related conditions.

**COUNT IV: ADA
UNLAWFUL DISCRIMINATION**

117.    Paragraphs 1-116 are incorporated by reference.

118.    Walmart's conduct constitutes unlawful discrimination against Tompkins in

violation of the ADA.

**COUNT V: ADA
FAILURE TO ACCOMMODATE**

119.    Paragraphs 1-118 are incorporated by reference.

120.    Walmart violated the ADA by failing to provide reasonable accommodations for

her protected disabilities.

**COUNT VI: ADA
UNLAWFUL RETALIATION**

121.    Paragraphs 1-120 are incorporated by reference.

122.    Walmart violated the ADA by retaliating against Tompkins because she required

and used medical leaves of absence as a reasonable accommodation for her disabilities.

**COUNT VII: TITLE VII
UNLAWFUL DISCRIMINATION**

123.    Paragraphs 1-122 are incorporated by reference.

124.    Walmart's conduct constitutes unlawful sex (pregnancy) discrimination against

Tompkins in violation of Title VII.

**COUNT VIII: TITLE VII
FAILURE TO ACCOMMODATE**

125.    Paragraphs 1-124 are incorporated by reference.

126.    Walmart violated the Title VII by failing to provide reasonable accommodation to her for her pregnancy in the same manner it reasonably accommodates other employees who are not pregnant.

COUNT IX: TITLE VII
UNLAWFUL RETALIATION

127.    Paragraphs 1-126 are incorporated by reference.

128.    Walmart violated Title VII by retaliating against Tompkins because she required and used a medical leave of absence as an accommodation for her pregnancy-related conditions.

COUNT X: FMLA

129.    Paragraphs 1-128 are incorporated by reference.

130.    Walmart violated Tompkins' prescriptive and proscriptive rights under the FMLA.

COUNTY XI: MFMLR

131.    Paragraphs 1-130 are incorporated by reference.

132.    Walmart violated Tompkins' prescriptive and proscriptive rights under the MFMLR.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

a)      Enter Judgment in Tompkins' favor;

b)      Declare the conduct engaged in by Defendants to be in violation of her rights;

c)      Enjoin Defendants, their agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

d)      Order Defendants to employ Tompkins in her former position or, in the alternative, award Tompkins front pay and benefits;

17

e)      Award equitable-relief for back pay, benefits and prejudgment interest;

f)      Award compensatory damages in an amount to be determined at trial;

g)      Award punitive damages in an amount to be determined at trial;

h)      Award liquidated damages in an amount to be determined at trial;

i)      Award nominal damages;

j)      Award attorney's fees, including legal expenses, and costs;

k)      Award prejudgment interest;

l)      Permanently enjoin Defendants from engaging in any employment practices which discriminate on the basis of disability, sex(pregnancy) or use of protected medical leave;

m)      Require Defendants to mail a letter to all employees notifying them of the verdict and stating that Defendants will not tolerate discrimination in the future;

n)      Require that Defendants post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

o)      Require that Defendants train all management level employees on the protections afforded by the MHRA, ADA, Title VII, FMLA and MFMLR;

p)      Require that Defendants place a document in Tompkins' personnel file which explains that Defendants unlawfully terminated her because of unlawful discrimination and retaliation; and

q)      Grant to Tompkins such other and further relief as may be just and proper.

Dated:  September 1, 2017

/s/ Chad T. Hansen
chansen@maineemployeerights.com

/s/ Peter Thompson
pthompson@maineemployeerights.com

Attorneys for the Plaintiff

MAINE EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343